And so we'll turn to the next case, United States v. Eichler, case number 18-8015. May it please the court. My name is Jason Wysoki. I'm here on behalf of Ms. Eichler, who is Mr. Carter's co-defendant. I want to focus on three issues today. The first is the district court's erroneous perjury enhancement at sentencing. Second, I want to dovetail off of some of Ms. O'Donnelly's arguments regarding the buy-sell agreement defense. And third, the district court's erroneous admission of 404B evidence, which I think is in greater contrast and relief today as a result of counsel's admission, which I appreciate. So let's talk about perjury first. It's important to understand why this error is even more critical today than it was when it happened. Congress just passed and the president signed into law the First Step Act, December 21st of 2018. That act broadens the safety valve provision under Section 3553. So a resentencing in this case would allow Ms. Eichler the opportunity, depending on how it goes underlying, to perhaps fit within that safety valve provision, which she may not have originally. So in this case, the court needs to take a really, really hard look at that perjury enhancement because it can have a significant impact on her resentencing. Is that a valid basis to consider the 3C1.1, that there may be additional unrelated relief from recent congressional action? It may be. I only bring it up, Your Honor, because what it does is it puts into very stark relief why this perjury enhancement is important and particularly important now. Regardless of whether or not the First Step Act had been passed, the perjury enhancement was erroneous and resentencing is necessary. But I think it demonstrates why resentencing can be even more impactful in this case, particularly if the court thinks that a resentencing would have almost no effect if she's only going to get resentenced to a 10-year mandatory minimum anyway. Because she now might qualify under a broader safety valve, it is more critical. So how did the court err? First, it failed to make any finding whatsoever that Ms. Eichler's testimony demonstrated a willful intent to lie. That's one of the fundamental elements under Dunnigan. Even if we assume, which we can't do as the appellate court, that Ms. Eichler's testimony was in fact false, there's no evidence or findings on the record that she willfully intended to lie. Okay. Let me ask, before you get into whether there was supporting evidence with regard to the existence of a finding, the judge did say, and I think I'm quoting it accurately, that there was credible evidence of prevarication. And as I understand the dictionary definition of prevarication, it's essentially to lie, to make a statement known to the maker with the intent to deceive. And it wasn't elaborate. It was just a handful of words. But doesn't that suffice to show that the judge was finding that Ms. Eichler testified falsely, that she knew that it was false, and that it was willful? Well, I don't think we need to go down a rabbit hole of definitions. But, Your Honor, I looked up the definition of prevarication. And the definition I found was that it is to evade the truth. Just like a politician, when asked a hard question on CNN or Fox News or whatever, might prevaricate in evading the truth, that doesn't mean that they are actually lying. And so I think the court's use of the word prevarication may or may not have been intentional with regard to that definition. But I think when the court is finding an enhancement for perjury, the court is required to set forth various elements and make specific findings if they can. That is the Supreme Court's preference. And here there is quite literally two paragraphs that the court articulates how he gets to a perjury enhancement. But there's never a finding of this is the testimony that I find was false, i.e., a lie. And I also find that Ms. Eichler willfully intended to lie. Those are two separate elements under Dunnegan, and they require separate findings. And here the testimony that the court was referring to, although we can't really say what the court is exactly referring to because he doesn't go through that process, the testimony that he is impliedly referring to is that Ms. Eichler testified she came to Wyoming to visit her children and came to Wyoming and when she came to Wyoming she partied, i.e., shared drugs with some buddies. Well, both those things are true. She did come to Wyoming to visit her kids. Ms. McKenna testified and corroborated Ms. Eichler's testimony. And she did come and party, did drugs, with some of her friends. Well, but isn't that, you know, the elephant in the room is that, you know, I go to, let's say I have children in Wyoming, and I go there to sell drugs and I have a couple of kids that live in Wyoming and I go, you know, have lunch and dinner with them. And then on the side, you know, that evening I go and sell a whole bunch of drugs. And then I'm on trial for a conspiracy to distribute 500 grams or more of methamphetamine. It's like, well, I was just going to visit my kids and party and share drugs. And, I mean, did she not testify that she never sold any of the drugs? Well, what's interesting is the court never goes through what testimony he believed to be false. Well, but I think as you were alluding to, I mean, impliedly he summarized the testimony, and I think that's what is precipitating your comments, that she testified that she was going to Wyoming to party, to see her kids, and to party and share drugs. What she left out was that Gilson and Flores testified, and the judge obviously credited their testimony, that she was also going to sell a whole bunch of methamphetamine. Well, that's the elephant in the room, right? It's absolutely the elephant in the room. And that's why it is critical for the judge to have actually addressed what the elephant was, because this court is not allowed to speculate what was in the district court's mind. Under the precedent that binds this court and bound the district court, the judge was required to make specific findings and not just allude to or allow this court to speculate later on appeal which particular portions of her testimony not only were false, but were willfully intended to be false to try and avoid some consequences of prosecution. And the court just simply never does that. And while I understand Your Honor's argument that, well, gee, she testified that she didn't sell drugs at all, what the court does here is doesn't flag that evidence. What the court says is Ms. Eichler explained she traveled to Wyoming to visit her children, admitted to sharing methamphetamine with various people. And that, the judge finds, contradicts other witnesses. In fact, that testimony is consistent with other witnesses. And when the judge – Well, the other witnesses didn't say she just gave us drugs for free. They did. In fact, all of the witnesses said that she would – everybody would share drugs. They also said that she would sell them drugs. But the district court doesn't even get there. And that, this court cannot speculate. The district court says, as I have referred to the testimony of Gilson, Flores, Maestas, and even McKenna, and buried within that testimony is evidence that, in fact, she sold drugs. Right. But the district court simply says I've referred to the testimony of Gilson, Flores, Maestas, and even McKenna. But the court doesn't identify what testimony he's referencing. And, in fact, when you look at the record, when you look at the transcript, the district court does nothing to flag what testimony he's referring to. And this court cannot, is not permitted to speculate. Was there an objection on that ground? Judge, we don't understand what you're talking about. This selling drugs business is foreign to us. It was the prosecution's burden by preponderance. But you're making an argument right now. Yes, I am. And was that argument made in the district court? Well, in the district court, before the judge made his findings, Ms. Eichler's counsel said there's no evidence that she actually willfully intended to lie or that she testified falsely. When the judge was making his findings, there was no objection to interrupt the judge. That is correct. Because my time is running so short, I would like to briefly address the 404B evidence, if I might, in light of counsel's concession today. If it's intrinsic, do we even care about 404B? If it's intrinsic, no. But this evidence is not intrinsic, and I think counsel's concession today highlights that point. This sting operation was presented to the jury as a sting operation associated with a meth deal. It was not. It was a sting operation that only dealt with cannabis, marijuana, weed, whatever you want to call it. I see my time is up. May I finish my point? Sure. Thank you. And that evidence, coupled with all of the other evidence that I've highlighted and quoted in my reply brief at pages 7 through 9, there was a very, very simple way for the prosecution to avoid injecting this. Because no deal, no transaction in this case was the meth transaction was dependent on the cannabis or marijuana transaction. Really what it was was a gratuitous injection of a quarter pound of marijuana here, an ounce of marijuana there, when all the prosecution had to do was say, did you, Mr. Gilson, buy methamphetamine from Ms. Eichler? Yes. When? How many times? Can I ask you, and I'm going to give you a little rebuttal time, one of the examples that you gave, I think between pages 7 and 9, was Flores' testimony of how he, when the government asked Mr. Flores, how did you come to know Mr. Carter? And the answer was, well, I asked Ms. Eichler, you know, where can I get marijuana? And she said, well, you can talk to Carter. And so you say, well, as I read your brief, well, the government instead could have said, well, how can I get more drugs? Well, if I take that, if we hypothetically use your counterpart to the question, that would have even been more and terribly unfairly prejudicial to Ms. Eichler, as well as Mr. Carter, because that would have insinuated that Ms. Eichler was telling Flores that she can get more methamphetamine from Carter when the reality was it wasn't. It was the less egregious drug of marijuana. And so isn't that one example one where it really was inextricably intertwined? And to ask the alternative question that you would have hypothetically posited would have been more prejudicial. I don't think it would have been more prejudicial, Your Honor, because this case was about methamphetamine. And so when Flores or Gilson or Maestas or even Ms. McKenna are testifying and the prosecution injects into the case evidence of a different drug being purchased by these people, often on completely separate occasions, I think it was Mr. Gilson, but my memory may be incorrect, in which the prosecution injected, I think it was eight different purchases, three of which or two of which were exclusively marijuana purchases. Why is that even in the case? It has nothing to do. It shows the relationship of the parties. But it's not inextricably intertwined into the conspiracy to distribute methamphetamine. Thank you, Your Honors. Thank you. Your Honors, may it please the Court? Mr. Wysoki? Your Honors, I'd like to begin, Judge Bacharach, with exactly the point you just made, and I would echo and agree with that. Inextricably intertwined evidence is not necessarily going to be prejudicial to the defendant. And if all the evidence of marijuana had been excised from this case, it indeed would have put the United States in a stronger position in terms of making its arguments, because if the only drug that's mentioned is methamphetamine, and then, for example, there's evidence of an intended meeting, the jury is more likely to infer that that was a methamphetamine meeting, exactly as you articulated, Judge Bacharach. In fact, the concession that I made this morning really illustrates that point, that if evidence of marijuana had been taken off the table entirely, then by presenting all that evidence of Ms. Eichler's arrest and the sting, the jury would have likely inferred the evidence was stronger of methamphetamine than it actually was. So I think this case really does illustrate why, under these facts, evidence of multiple substances is intrinsic. Let me probe that a little bit further, though. Other than that one example that I gave, there did seem to be a lot of examples that Ms. Eichler's lawyer presented in her blue brief that there were a lot of seemingly gratuitous questions about marijuana that really could have easily been excised, right? I mean, it did seem that the government was, maybe it wasn't, I'm not suggesting that it was insidious or that it was intended to prejudice Ms. Eichler, that may or may not be the case, but it did seem that there were a lot of irrelevant references to marijuana in the questioning. Do you agree or disagree? Your Honor, I don't know about irrelevant, because I believe that it was all inextricably intertwined. Now, certainly there's a spectrum. I guess one would say that some of the references to marijuana were more important than others. For example, I think I certainly could have, let's take the example of Mr. Flores, the example of how he comes to begin dealing with Mr. Carter, and because it was a marijuana source, I think for the reasons you articulated, really that's important evidence to get out and not prejudicial. Well, okay, sorry, you finish your answer. I was just going to say, Your Honor, that perhaps in then following up on their relationship, I certainly could have only asked about methamphetamine purchases and left out the marijuana, although to some extent I think that would have painted just, not necessarily unfair, but certainly an inaccurate picture of the relationship that these men had. Well, in that example that you're using, the question was, I mean, the interrelationship was elucidated because of your question, and that question was, as I recall, how did you come to know Mr. Carter? Well, they were boyfriend and girlfriend and lived in the same house. You know, that might have been a good answer. And so when you say it's inextricably intertwined, well, yeah, it was inextricably intertwined for something that may or may not have been material to this charge involving methamphetamine, and if it was inextricably intertwined but not material to this particular conspiracy, it seems to me that there might be a problem under Rule 403. What do you think? Well, Your Honor, certainly I think that if it fails under Rule 403, then I suppose even if it's inextricably intertwined, then it would be inadmissible. Based on the circumstances, the charge was methamphetamine, the additional conduct was the less serious marijuana, maybe that helps to draw the sting a little bit there. And I've lost my train of thought a little bit, but the other point that I wanted to make on that, and maybe I'll hopefully circle back to your question, Judge Bacharach, is that by hiding the ball, so to speak, by excising the references to marijuana, that also prejudices the government because it opens the door to defense testimony that then brings up marijuana, which at that point the jury is left to wonder, well, why didn't we hear about marijuana before? Why is there now evidence that marijuana is being distributed and no one else said that? And then do I have to recall witnesses? And why didn't I ask the questions about marijuana? An example along those lines actually happened in this case, Your Honor. It's footnoted in the government's brief. It had to do with Xanax pills that Ms. Eichler possessed when she was stopped in Utah. And out of an abundance of caution, I didn't ask the state trooper about the Xanax pills. I asked him about meth or what appeared to be meth and what appeared to be marijuana. And I don't remember specifically if I didn't realize that there had been pills and it came out in witness prep or maybe I did know. I don't remember the details. But the bottom line is I didn't ask about the Xanax. When Ms. Eichler testified in her own defense, she brought it up. And because I hadn't asked about it, she answered some of my questions bringing the Xanax up. And I was in a position where I really couldn't refute it. My trooper had testified. He was on his way back to Utah. So that anecdote illustrates at least one potential pitfall for the government in doing that sort of thing. Well, if it had been marijuana, you're a really excellent lawyer. I'm sure you would have stood up and said, Judge, we want to approach. And the first thing out of your mouth was they opened the door. Judge, you granted this motion in limine about marijuana. And here they are arguing it about marijuana. We want you to revisit your grant of the motion in limine. Certainly, Your Honor. And I could have recalled witnesses who were in custody and then elicited the testimony. So certainly that would have been possible. But I do think really, Your Honor, to circle back really to the point you made that I led with, is that this inextricably intertwined evidence, in this case at least, was not really prejudicial to the defendants. There were arguments to be made that, for example, that traffic stop I mentioned, the Utah stop where Mr. Gilson had arranged to obtain methamphetamine and marijuana, I think there were defense arguments to be made that the fact that Ms. Eichler was dealing with both substances really diffuses the level of her conduct. Because if we're only dealing with methamphetamine, it's much easier for me to argue that, well, this bit of circumstantial evidence is evidence of methamphetamine trafficking. If marijuana is interjected, it changes the game, so to speak, and really not in the government's favor. So I think this case really illustrates why the inextricably intertwined analysis applies to this sort of circumstance. Can I ask you an unrelated question, which is in the brief you speak about Ms. Eichler's own efforts and the methamphetamine that she sold, and you estimate 438 to 522 grams, and yet preceding that there's an account of all of the transactions and the testimony and the estimates by the witnesses, which far exceeds that amount. And so I'm curious why. Where does that number come from, 435 to 522, which, of course, matters because we're straddling the B1A. That's right, Your Honor. As I recall, my estimate for Ms. Eichler's conduct was really restricted to what she herself had distributed. So that was methamphetamine that she distributes to Flores, methamphetamine that she distributes to Gilson, methamphetamine that she distributes to Maestas, the methamphetamine that was seized in that traffic stop, and then I believe I also included the methamphetamine that Gilson traded or that he obtained when he traded the vehicle. His testimony wasn't entirely clear where that came from, but it seemed that she was at least involved in that transaction since she ended up driving the vehicle. So as I, just glancing back over the brief, Your Honor, I believe that's where I came up with that number was meth she dealt to Gilson, that she dealt to Maestas, that she dealt to Flores, that she lost in that traffic stop, and then the three ounces that allegedly or that Mr. Gilson testified were involved in that exchange for the vehicle. Well, I wondered if you'd taken Mr. Gilson out because he wasn't charged. Because when I use the numbers that you do with Gilson included, it far exceeds that amount. And maybe it's my mistake. I'll double check. And what I didn't include in that quantity, Your Honor, is the methamphetamine that Mr. Gilson said he got in Midvale. So I excluded those quantities. I put those into Mr. Carter's calculation instead. So in dealing with Ms. Eichler's, that $438 to $522, I believe it was just, it didn't include those Midvale transactions. Your Honors, I see my time is almost up, so I thank the Court for its consideration. Thank you. Well, I'm going to give, I've occupied so much of your time, so I'm going to give you two and a half minutes for rebuttal. And the only reason I'm doing that, Mr. Zott, is it was my fault that he went so over time. Thank you, Your Honor, for the additional time. I would basically just address two brief issues here. The inextricably intertwined, it has to be inextricably intertwined under U.S. v. Ford with the charge defense. The fact that, for example, which isn't even, you know, part of the evidence here, but just hypothetically, if Mr. Carter and Mr. Flores, you know, got together every week to play poker and smoke weed, that would be inextricably intertwined with their relationship, but not with the charge defense. And that's really the critical part here. And this 404B evidence, as Judge Bachrach, you pointed out, is this marijuana evidence is all over the case. But if there was, okay, let me ask you this. If there was one instance, hypothetically, that we can point to and say, well, this one instance really was not gratuitous, then we would have to reject your appeal point, right? Let's say there was, hypothetically, there was 20 references during the trial to marijuana, and we say one was appropriate, 19 were inappropriate. Well, the correct ruling on a motion in limine then would be to deny Ms. Eichler's motion in limine, and then every gratuitous moment, hypothetically, that it's referenced, then you're going to approach the bench and say, Judge, I know you deny the motion in limine, but this is gratuitous. So it seems like you have a really big hurdle, just based on the bar, that you have to show that it's not inextricably intertwined for every single one of the references to marijuana. Am I wrong? I don't know if that's necessarily correct, Your Honor. Perhaps from a denial of a motion in limine standpoint, yes. But preservation of this error has not been raised by the government. They did not in their brief say, because Ms. Eichler didn't object each time this evidence was presented, that it's waived. So I don't think that's an issue that this court can get to because it wasn't an argument made. But critically, what I did, hopefully exhaustively in the briefs, was go through each instance when it was put forth, and I do think, and I stand on those briefs, that it was really gratuitous. Let me read you one sentence from, of course, an important case, Evans, which is, an agreement to distribute drugs can sometimes, quote, That sounds like intrinsic capital I. Yes. I mean, I'm not going to argue that Evans was incorrect, but I don't think it applies here. And I think it doesn't apply here because this relationship amongst these co-conspirators, first of all, the relationship between Eichler and Carter is obvious. They live together. They're boyfriend and girlfriend. The cannabis evidence has nothing to do with that relationship. The relationship amongst the other folks that are sold to, whether they're charged co-conspirators or not, is simply, we are selling you methamphetamine, and every time that the government wants to talk about methamphetamine, they inject, gratuitously, this evidence of cannabis. Thank you. Thank you. Thank you, both counsel, for your excellent advocacy in your briefs and in your arguments today. This matter will be submitted.